**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| **MAGNACROSS LLC,** <br><br> Plaintiff, <br><br> v. <br><br> **CELLCO PARTNERSHIP D/B/A VERIZON WIRELESS**, <br><br> Defendant. | CASE NO. 2:15-cv-844-JRG-RSP (LEAD CASE) (CONSOLIDATED) **PATENT CASE** |

**MAGNACROSS LLC'S OPENING CLAIM CONSTRUCTION BRIEF**

David R. Bennett
DIRECTION IP LAW
P.O. Box 14184
Chicago, IL 60614-0184
Telephone: (312) 291-1667
e-mail:  dbennett@directionip.com

**ATTORNEY FOR PLAINTIFF
MAGNACROSS LLC**

Dated:  March 11, 2016

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................................ i

TABLE OF CITATIONS ............................................................................................. iii

TABLE OF EXHIBITS ................................................................................................ v

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................... 1

I.     OVERVIEW OF THE PATENT-IN-SUIT ...................................................... 1

     A.     The Patent-in-Suit is Directed to Improvements to Wireless Transmission of Data from Data Sensors with Different Data Rate Requirements ....................... 2

     B.     Claims at Issue ................................................................................. 3

     C.     The Prosecution History of the Patents-in-Suit ................................. 4

          1.     Restriction Requirement ........................................................ 4

          2.     First Office Action ................................................................ 4

          3.     Response to First Office Action .............................................. 5

II.     APPLICABLE LAW ...................................................................................... 6

     A.     Law of Claim Construction .............................................................. 6

     B.     Law of Indefiniteness ....................................................................... 7

     C.     Means-Plus-Function Language ........................................................ 8

III.     CLAIM TERMS AT ISSUE ........................................................................... 8

     A.     The Preambles are Non-Limiting (Claims 1 and 12) ......................... 9

     B.     "Data Sensors" (Claims 1 and 12) ................................................ 11

     C.     "Local Data Sensors"/"Said Local Sensors" (Claims 1 and 12) .......... 11

     D.     "Data Processing Means" (Claims 1 and 12) .................................. 12

     E.     "Channel"/"Communications Channel" (Claims 1 and 12) ............... 14

     F.     "Sub-Channel" (Claims 1 and 12) ................................................ 15

G.      "Division of Said [Communications] Channel into Sub-Channels" (Claims 1 and 12) .............................................................................................................16

H.      "Allocating Data From Said Local Data Sensors to Respective Ones or Groups of Said Sub-Channels in Accordance with the Data Carrying Capacities of Said Sub-Channels" / "Allocating of Data From Said Local Data Sensors to Respective Ones or Groups of Said Sub-Channels in Accordance with…Data Rate Requirements From Said Local Sensors" (Claims 1 and 12) ................................................................................................18

I.      "Control Means" (Claim 12) .................................................................................20

J.      "Transmit" and "Transmission" (claims 1 and 12) ...............................................22

K.      "Transmitting Said Data From Said Data Sensors Respectively Through Said Sub-Channels Accordingly" (Claim 1)/"Transmitter Adapted to Transmit Said Data Through Said Sub-Channels Accordingly" (Claim 12) .........23

L.      Data Rate "Differing Substantially" / "Substantially Different" Data Rate (Claims 1 and 12) .................................................................................................24

M.      "Multiplexer" (Claim 12) .....................................................................................26

CONCLUSION ....................................................................................................................... 27

# TABLE OF CITATIONS

**Page(s)**

**Cases**

*Altiris, Inc. v. Symantec Corp.*,
318 F. 3d 1363 (Fed.Cir. 2003) ................................................................ 13

*Altiris, Inc. v. Symantec Corp.*,
318 F.3d 1363 (Fed.Cir. 2003) ................................................................ 10

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed.Cir. 2014) ............................................................ 8, 21

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
388 F.3d 858 (Fed.Cir. 2004) ................................................................... 6

*Clear With Computers v. Hyundai Motor America, Inc.*,
Case No. 6:09-cv-479, slip. op. (E.D. Tex. Jan. 5, 2011) (Ex. I) ............................... 9

*Ecolab Inc. v. Envirochem, Inc.*,
264 F.3d 1358 (Fed.Cir. 2001) ............................................................... 24

*Haemonetics Corp. v. Baxter Healthcare Corp.*,
607 F.3d 776 (Fed.Cir. 2010) ............................................................... 8, 9

*Liebel-Flarsheim Co. v. Mallinckrodt, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) ......................................................... 6, 7, 20

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed.Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370, 388-90 (1996) ................. 6, 7

*Nautilus, Inc. v. Biosig Instru., Inc.*,
572 U.S. ___, 134 S.Ct. 2120 (2014) .................................................... 1, 7, 8

*Orion IP, LLC v. Staples, Inc., et al.*,
Case No. 2:04-cv-297-LED, slip. op. (E.D. Tex. Dec. 15, 2005) (Ex. J) ......................... 9

*Pall Corp. v. Micron Separations, Inc.*,
66 F.3d 1211 (Fed.Cir. 1995) ................................................................ 25

*Renishaw PLC v. Marposs Societa' per Azioni*,
158 F.3d 1243 (Fed.Cir. 1998) ................................................................ 7

*Rexnord Corp. v. Laitram Corp.*,
274 F.3d 1336 (Fed.Cir. 2001) ................................................................ 7

*Schumer v. Lab. Computer Sys., Inc.*,
308 F.3d 1304 (Fed.Cir. 2002) ............................................................... 10

*Teleflex Inc. v. Ficosa N. Am. Corp.*,
   299 F.3d 1313 (Fed.Cir. 2002) ............................................................................ 7

*Teva Pharms. USA, Inc v. Sandoz, Inc.*,
   No.13-854, slip op. at 6, 574 U.S. __ (2015)...................................................... 6

*Thorner v. Sony Computer Entertainment America LLC*,
   669 F.3d 1362 (Fed.Cir. 2012) ...................................................................... 7, 12

*Verve, LLC v. Crane Cams, Inc.*,
   311 F.3d 1116 (Fed.Cir. 2002) .............................................................. 24, 25, 26

*Wellman, Inc. v. Eastman Chem. Co.*,
   642 F.3d 1355 (Fed.Cir. 2011) ........................................................................ 1, 9

**Statutes**

35 U.S.C. §112, ¶6............................................................................................. 8, 9

**TABLE OF EXHIBITS**

Exhibit A        United States Patent No. 6,917,304

Exhibit B        Excerpt of Original Claims from Application Serial No. 09/402,262, which issued
                 as the '304 Patent, dated October 1, 1999 (MAG000366-371)

Exhibit C        Restriction/Election Requirement for Serial No. 09/402,262
                 dated June 10, 2004 (MAG000054-58)

Exhibit D        Response to Restriction Requirement - Election for Serial No. 09/402,262
                 dated July 2, 2004 (MAG000051-53)

Exhibit E        First Office Action for Serial No. 09/402,262
                 dated October 4, 2004 (MAG000040-47)

Exhibit F        Amendment and Response to First Office Action for Serial No. 09/402,262
                 dated December 14, 2004 (MAG000030-38)

Exhibit G        Notice of Allowability dated February 11, 2005 (MAG000022-25)

Exhibit H        Certificate of Correction dated September 6,2005, for U.S. Patent No. 6,917,304
                 (MAG000012)

Exhibit I        *Clear With Computers v. Hyundai Motor America, Inc.*,
                 Case No. 6:09-cv-479, slip. op. (E.D. Tex. Jan. 5, 2011)

Exhibit J        *Orion IP, LLC v. Staples, Inc., et al.*,
                 Case No. 2:04-cv-297-LED, slip op. (E.D. Tex. Dec. 15, 2005)

Exhibit K        Asserted claims 1 and 12 with disputed claim terms and phrases in
                 bold/underline

Pursuant to the Court's Docket Control Order and P.R. 4-5, Plaintiff, Magnacross LLC ("Magnacross"), serves this opening claim construction brief on Defendants BLU Products, Inc., Sprint Spectrum L.P., T-Mobile USA, Inc., and YiFang USA Inc. dba eFun (collectively, "Defendants").[1]

## INTRODUCTION

Magnacross alleges that Defendants infringe claims 1 and 12 of U.S. Patent No. 6,917,304 ("the '304 patent" or "patent-in-suit").[2]   Thirteen claim terms are at issue. Magnacross contends that one term requires construction.  Defendants contend that 12 terms require construction, two of which they allege are in means-plus-function form, and one term they allege is indefinite.[3]  Defendants' proposed terms for construction account for 75% of the words for each asserted claim.   For the Court's convenience, a copy of the asserted claims identifying the terms and phrases at issue emphasized is attached as Exhibit K.

## ARGUMENT

## I.    OVERVIEW OF THE PATENT-IN-SUIT

The '304 patent, which is based on a foreign application filed in 1997, is titled "Wireless Mutliplex [*sic*] Data Transmission System" and issued on July 12, 2005.  (Ex. A).  The following

---

[1]    The remaining non-dismissed defendants (ASUS Computer International, AT&T Mobility LLC, Cellco Partnership d/b/a Verizon Wireless) are either stayed or have filed a motion to stay.  (Dkt. Nos. 196, 201, 202).

[2]    A copy of the '304 patent is attached as Exhibit A to the Declaration of David R. Bennett, concurrently filed herewith.  All citations to Exhibits refer to the exhibits to the attached Declaration of David R. Bennett.

[3]    Indefiniteness is a form of invalidity subject to a clear and convincing evidence standard, with Defendants bearing the burden of proof.  *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 783 (Fed.Cir. 2010); *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1366 (Fed.Cir. 2011); *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed.Cir. 2009) ; *see Nautilus, Inc. v. Biosig Instru., Inc.*, 572 U.S. ___, ___, 134 S.Ct. 2120, 2131 n. 10 (2014).  Although Magnacross submits argument below, Magnacross does not have a burden to submit rebuttal arguments or evidence before Defendants attempt to make a *prima facie* case of indefiniteness.  To the extent that Defendants make such an attempt, Magnacross reserves the right to introduce further rebuttal argument and evidence.

overview will discuss the intrinsic evidence as it relates to the asserted claims.

**A.    The Patent-in-Suit is Directed to Improvements to Wireless Transmission of Data from Data Sensors with Different Data Rate Requirements**

The invention relates to methods and apparatuses for the wireless transmission of data through a communications channel from at least two local data sensors to a data processor.  (Ex. A at col. 1:4-7).  Prior to the filing of the initial application in 1997, the inventors of the '304 patent recognized that there were problems with the efficiency of transmitting data from sensors to data processors.  (Ex. A at col. 1:4-7; col. 2:5-13). Conventional methods usually had data transmitted from data sensors to the data processors using cables that put limitations on the convenience and operations of the equipment.  (*Id.* at col. 1:37-40).  Attempts were made to achieve wireless transmission from the data sensors to data processors; however, these attempts had shortcomings.  One main issue with the conventional wireless transmission systems is they resulted in inefficient bandwidth utilization.  (*Id.* at col. 1:50 – 2:1).  For example, in a system in which there are sensors that require high data transmission rates and sensors that require lower data transmission rates, a conventional system would set aside the same amount of bandwidth for both types of sensors necessarily resulting in overutilization or underutilization of bandwidth requirements.  (*See id.*).

The inventors therefore created a method and system by which data sensors with substantially different data rates required for data transmission would have the data transmitted over an asymmetrically divided communication channel such that the data from the sensors is allocated to ones or groups of the sub-channels based on the data carrying capacities of the sub-channels.  (*See id.* at col. 7:30-45; col. 8:20-35).  For example, a data sensor with higher data rate requirements was assigned a sub-channel or group of sub-channels with a higher data rate capacity and a data sensor with lower data rate requirements was assigned a sub-channel with a

lower data rate capacity.  (*e.g.*, *see id.* at col. 5:22-26).  Further explanation of the invention will be addressed in the context of the claim construction analysis below.

**B.  Claims at Issue**

Magnacross is asserting claim 1 (a method claim) and claim 12 (an apparatus claim) of the '304 patent, which are both directed to the wireless transmission of data in digital and/or analogue format through a communications channel from at least two data sensors to a data processing means.  Claim 1 states as follows:

> A method of wireless transmission of data in digital and/or analogue format through a communications channel from at least two data sensors to a data processing means said method comprising the step of division of said channel into sub-channels and transmitting said data from said data sensors respectively though said sub-channels accordingly; characterized by
>
> a) said step of division of said communications channel being effected asymmetrically whereby the data carrying capacities of said sub-channels are unequal; and
>
> b) the data rate required for data transmission from said local sensors differing substantially between said at least two sensors; and
>
> c) allocating data from said local data sensors to respective ones or groups of said sub-channels in accordance with the data carrying capacities of said sub-channels.

(Ex. A at col. 7:30-45).  The invention in claim 1 divides a communication channel asymmetrically into sub-channels so that the data carry capacities of the sub-channels are unequal.  (*Id.* at col. 7:33-39).  Claim 1 also requires data from at least two sensors that have substantially different data rates required for transmission.  (*Id.* at col. 7:40-42).  The claim allocates data from the data sensors to ones or groups of sub-channels in accordance with the data carrying capacities of the sub-channels.  (*Id.* at col. 7:43-45).  Claim 12 has similar limitations and is shown in Exhibit K with the disputed terms emphasized.  (*Id.* at col. 8:20-35).

C.      **The Prosecution History of the Patents-in-Suit**

The following is a summary of the patent-in-suit's prosecution history as it relates to the

terms before the Court.  The initial application had 25 claims.  (Ex. B at MAG000336-371).

1.      **Restriction Requirement**

The examiner contended that the initial application contained two inventions that were

not so linked as to form one general inventive concept.  (Ex. C at MAG000056-57).  The first

group was drawn to a method for wireless transmission of data in digital and/or analogue format

through a communication channel from at least two local data sensors to a data processor.  (*Id.*).

The second group was drawn to a specific method for vibration analysis of a machine or other

articles.  (*Id.*).  The examiner therefore required the applicant to elect between the two groups.

(*Id.*).  Applicant elected to proceed with the first group.  (Ex. D at MAG000052-53).

2.      **First Office Action**

The Examiner rejected application claims 1 and 13 (which eventually issued as claims 1

and 12) as obvious over U.S. Patent 4,738,133 ("Breckel") in view of U.S. Patent 5,509,013

("Adachi").  (Ex. E at MAG000043).  The Examiner contended that Breckel teaches wireless

transmission of data through a communication channel from at least two local data sensors to a

data processing means and comprises the step of division of said channel into sub-channels and

transmitting said data from said data sensors respectively through said sub-channels accordingly.

(*Id.*).  However, the examiner stated that Breckel did not teach the "sub-channels having unequal

data carrying capacities and data rates; and allocating data from said local data sensors to

respective ones of said sub-channels in accordance with the data carrying capacities of said sub-

channels."  (*Id.* at MAG000043-44).

The examiner also contended that Adachi disclosed a transmission system having "a

multiplexer for providing many sub-channels… having different data transmission speeds to suit

economical demands….." (*Id.* at MAG000044).   The examiner argued that high data speed results in high data transmission and high data capacity would also result in high data transmission.   (*Id.*).   The examiner therefore argued that a person skilled in the art would "recognize that allocating more data to be transmitted through a high data transmission speed/capacity channel and less data to be transmitted through a low data transmission speed/capacity channel would have been obvious and logical in order to efficiently and optimally transmit different amount of data through different sub-channels simultaneously." (*Id.*).

### 3.    Response to First Office Action

Applicant stated that Breckel does not teach transmission speeds or data carrying capacities.   (Ex. F at MAG000036).   Applicant also stated that Adachi discloses using time-division multiplexing for controlling the multiplexing of data from pre-existing channels with different data transmission speed such that data channels having higher transmission speeds are more frequently multiplexed than data channels having lower transmission speeds.   (*Id.*).   However, applicant stated that Adachi does not disclose "whether the data sources are sensors or whether or not they have different data rate requirements." (*Id.*).   Adachi also did not disclose identifiable sub-channels to which specific sources can be assigned.   (*Id.* at MAG000037).   Applicant also explained that it would not have been obvious to combine Breckel and Adachi. (*Id.*).   Breckel discloses sensors which have the same data rates so there would have been no point to use Adachi for sub-channels having different data-carrying capacities, even if Adachi had such disclosures.  (*Id.*).

In view of the response, all claims were allowed.   (Ex. G).   A Certificate of Correction issued on September 6, 2005, correcting some typographical errors.   (Ex. H).

## II.     APPLICABLE LAW

### A.      Law of Claim Construction

Claim construction presents a question of law to be decided by the Court.  *Teva Pharms. USA, Inc v. Sandoz, Inc.*, No.13-854, slip op. at 6, 574 U.S. __ (2015); *also Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-78 (Fed.Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370, 388-90 (1996).  Where the meaning of a claim term is in dispute, the disputed term is assigned its ordinary and customary meaning as viewed through the eyes of a person of ordinary skill in the art at the time of the invention after considering all of the intrinsic evidence.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed.Cir. 2005) (*en banc*).  When that ordinary meaning is "readily apparent," claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

Courts rely primarily on the patent's intrinsic evidence (*i.e.*, the patent and its prosecution history) to determine the scope of the invention.  *See C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed.Cir. 2004).  The claims themselves provide "substantial guidance" to the meaning of particular claim terms.  *Phillips*, 415 F.3d at 1314.  *Liebel-Flarsheim Co. v. Mallinckrodt, Inc.,* 358 F.3d 898, 906, 910 (Fed. Cir. 2004).  The claims, of course, are not read alone.  Rather, the person of ordinary skill in the art is deemed to read the claim terms in the context of the entire patent, including the specification and prosecution history.  *Phillips,* 415 F.3d at 1313.  For example, where the specification reveals a special definition given to a claim term by the inventor that differs from the meaning it would otherwise possess, the inventor's lexicography controls.  *Id.* at 1316.

Similarly, where the specification reveals an intentional disclaimer, or disavowal, of claim scope by the inventor, the objective evidence of the inventor's intention is again dispositive.  *Id.*  But, the Federal Circuit has cautioned, "[a]lthough the specification often

6

describes very specific embodiments of the invention," it is improper to "confin[e] the claims to those embodiments." *Id.* at 1323; *see also Liebel-Flarsheim,* 358 F.3d at 906.  For example, even when the specification describes only a single embodiment, the claims cannot be read restrictively unless the patentee has manifestly stated a clear intention to limit claim scope. *Thorner v. Sony Computer Ent. America LLC*, 669 F.3d 1362, 1365 (Fed.Cir. 2012); *Teleflex Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327-28 (Fed.Cir. 2002).  Nor is an applicant "required to describe in the specification every conceivable and possible future embodiment of his invention." *Rexnord Corp. v. Laitram Corp.,* 274 F.3d 1336, 1344 (Fed. Cir. 2001).

A court should also consider a patent's prosecution history, if it is in evidence.  *Phillips,* 415 F.3d at 1317.  The prosecution history, however, "cannot 'enlarge, diminish, or vary' the limitations of the claims."  *Markman,* 52 F.3d at 98 (citations removed).  Additionally, a court also may rely on "extrinsic evidence," which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980; *see also Phillips*, 415 F.3d at 1314.  In sum, the correct construction will be the one that "stays true to the claim language and most naturally aligns with the patent's description of the invention."  *Id.* at 1316 (*quoting Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1250 (Fed.Cir. 1998)).

## B.    Law of Indefiniteness

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Nautilus*, 134 S.Ct. at 2124.  The certainty required "is not greater than is reasonable, having regard to [the patent's] subject matter."  *Id.* at 2129.  Definiteness is measured from the viewpoint of a person skilled in the art at the time the patent was filed.  *Id*. at 2128.  The standard for definiteness "take[s] into account the inherent

limitations of language," and "[s]ome modicum of uncertainty… is the price of ensuring the appropriate incentives for innovation." *Id.* (citations and quotes removed).  The burden is on the accused infringer to prove that a claim is invalid for indefiniteness by clear and convincing evidence. *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 783 (Fed.Cir. 2010); *see Nautilus*, 132 S.Ct. at 2131 n.10.

### C.    Means-Plus-Function Language

Whether a claim term is in means-plus-function format is a question of law.  *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1296 (Fed.Cir. 2014).  Under 35 U.S.C. §112, ¶6:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

A means-plus-function analysis is a two-step process.  *Apple*, 757 F.3d at 1296.  First, the Court determines "if the claim limitation is drafted in means-plus-function format." *Id.*  As part of this step, the Court "must construe the claim limitation to decide if it connotes 'sufficiently definite structure' to a person of ordinary skill in the art" for which the Court looks "to the specification, prosecution history, and relevant external evidence to construe the limitation." *Id.*  "A limitation has sufficient structure when it recites a claim term with a structural definition that is either provided in the specification or generally known in the art." *Id.* at 1299  Second, "if the limitation is in means-plus-function format, [the Court] must specifically review the specification for 'corresponding structure.'" *Id.* at 1298. There is some overlap between these two steps but the two inquiries are distinct.  *Id.*

## III.    CLAIM TERMS AT ISSUE

Magnacross proposes that most claim terms at issue are terms used according to their customary and ordinary meaning and therefore do not need construction by the Court.  *Biotec*

*Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed. Cir. 2001); *Clear With Computers v. Hyundai Motor America, Inc.*, Case No. 6:09-cv-479, slip. op. at 11 (E.D. Tex. Jan. 5, 2011) (Ex. I).  Stated another way, a claim term that is "not used in the claims in any manner different from its ordinary meaning in the art, which is no different than its ordinary lay meaning," does not need construction.  *Orion IP, LLC v. Staples, Inc., et al.*, Case No. 2:04-cv-297-LED, slip op. at *7 (E.D. Tex. Dec. 15, 2005) (Ex. J).

Defendants propose constructions that are inconsistent with the ordinary meaning of the terms, their own constructions, and the intrinsic evidence.  Defendants contend that two terms should be construed according to 35 U.S.C. §112, ¶6 (means-plus-function) and one term is indefinite.  To date, Defendants have presented no evidence or argument in support of their indefiniteness arguments for which they bear the burden of proof of showing indefiniteness by clear and convincing evidence.  *Haemonetics Corp.*, 607 F.3d at 783; *Wellman*, 642 F.3d at 1366 (defendants have the burden of proving by clear and convincing evidence "that one of ordinary skill in the relevant art could not discern the boundaries of the claim based on the claim language, the specification, the prosecution history, and the knowledge in the relevant art."); *Titan Tire*, 566 F.3d at 1376 ("Because of this presumption [of invalidity], an alleged infringer who raises invalidity as an affirmative defense has the ultimate burden of persuasion to prove invalidity by clear and convincing evidence….").

### A.   The Preambles are Non-Limiting (Claims 1 and 12)

- "1. A method of wireless transmission of data in digital and/or analogue format through a communications channel from at least two data sensors to a data processing means"

- "12. Apparatus for wireless transmission of data in digital and/or analogue format through a communications channel from at least two local data sensors to a data processing means"

| Magnacross | Defendants |
|---|---|
| The preambles are not a limitation. | The preambles are a limitation. |

The preambles, which are nearly identical, do not add meaning to the claims and are therefore not limitations.   Regardless, to the extent the Court finds that the preambles are limitations, as argued below with respect to the specific separate terms, the separate terms in the preambles are used according to their ordinary meaning and do not require construction.

The preambles are not claim limitations because they do not "constitute or explain a claim limitation" and are "not necessary to give life, meaning and vitality to the claim." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1371 (Fed.Cir. 2003).  The preambles "merely recite a purpose of the invention and do[ ] not add anything to the body of the claims." *Id.* at 1372.  The preambles, like the specification, state that the invention relates to the wireless transmission of data through a communications channel from data sensors to a data processing means. *See id.*; (*e.g.*, Ex. A at 1:51-54).  However, the preamble does not specify how the device is to operate with respect to those features.  *Schumer v. Lab. Computer Sys., Inc.,* 308 F.3d 1304, 1310 (Fed.Cir. 2002); (Ex. A at col. 7:30-33).   After the preamble, claim 1 provides the detailed functional attributes for a device to perform the method, namely the steps for how the device divides the channels into sub-channels, and transmits the data through the sub-channels. *See id.*; (Ex. A at col. 7:30-32; col. 8:20-23).  Claim 12 likewise provides all the attributes of the claimed apparatus after the preamble, namely the apparatus comprises a multiplexer, control means, and transmitter. *See Schumer*, 308 F.3d at 1310; (Ex. A at col. 8:23-35).  This is a situation in which the preambles are superfluous because they only describe a purpose of the invention and do not add anything to the body of the claims.  *See Schumer*, 308 F.3d at 1310.  The preambles are therefore not limitations.

### B.   "Data Sensors" (Claims 1 and 12)

| Magnacross | Defendants |
|---|---|
| "sensors that may transmit raw data for subsequent processing or may incorporate some degree of primary data processing whereby the data received at the main processor is partially or totally preprocessed, or raw data" | No construction necessary. |

"Data sensors" should be construed to mean "sensors that may transmit raw data for subsequent processing or may incorporate some degree of primary data processing whereby the data received at the main processor is partially or totally pre-processed, or raw data."

This construction comes from the specification, which states "In this specification and the claims, references to local data sensors are to be interpreted in accordance with the following, namely that the sensors may transmit raw data for subsequent processing or may incorporate some degree of primary data processing whereby the data received at the main processor is partially or totally pre-processed, or raw data."   (Ex. A at col. 1:23-29).   This construction is consistent with the remainder of the specification.   (*Id.* at col. 2:5-13, 60-64; col. 6:42-50; col. 7:1-8).   The dependent claims further support that the data sensors may include data processing functionality.   (*Id.* at col. 7:63-65; 8:54-57).   Magnacross therefore respectfully requests that the Court adopt Magnacross's proposed construction.

### C.   "Local Data Sensors"/"Said Local Sensors" (Claims 1 and 12)

| Magnacross | Defendants |
|---|---|
| Plain and ordinary meaning | data sensors located nearby the data processing means (e.g., within the same room) |

Although Defendants propose a phrase for construction, Defendants do not seek a construction of data sensor and instead only propose a construction for "local."  "Local" is not a technical term and is instead used according to its plain and ordinary meaning.

11

The term "local" is not given any special meaning in the specification.  The specification provides examples of "local" sensors consistent with what could be described as local; however, these are non-limiting examples and there is no clear intention to limit the ordinary meaning of "local."  *Thorner*, 669 F.3d at 1365; (Ex. A at col. 1:4-10, 15-18, 23-29; col. 2:1-13).  The term "local" was not discussed during the prosecution history and did not have any significance to distinguishing over any prior art.  (*See* Ex. F at MAG000036-37).  At most, the specification uses the term "local" to describe that the sensors and data processing means must be close enough to allow for wireless transmission of data, which is consistent with the ordinary meaning of the term.  (Ex. A at col. 1:4-10, 15-18, 23-29; col. 2:1-13; col. 3:2-11; col. 4:10-13, 36-45; col. 6:64 – col. 7:8; col. 7:30-45, 59-62; col. 8:20-35; Figs. 2-6).

Defendants seek to improperly narrow the term "local" to preferred embodiments.  The specification has embodiments in which transmission of data occurs across a room solely in the context of business applications; however, other examples are silent as to how far the sensors are from the data processing means.  (*Compare* Ex. A at col. 1:15-18, 1-4 *with, e.g.*, Ex. A at col. 1:4-7, 23-29, col. 2:5-13, 60-64; col. 3:2-8, Figs. 1-6).  The specification also does not use the term "nearby," which is proposed by Defendant and does not provide any clarity over the term "local."  Because the patent uses the term "local" according to its plain and ordinary meaning, there is no need to construe the term.

### D.    "Data Processing Means" (Claims 1 and 12)

| Magnacross | Defendants |
|---|---|
| Term is in the non-limiting preamble, so no construction is necessary.  Otherwise, it used according to its plain and ordinary meaning. | personal computer or workstation configured to receive decoded sensor data and provide it to virtual serial ports for analysis and/or display (under § 112 ¶ 6) |

12

"Data processing means" is only used the preamble of the claims and therefore is not a limitation and does not require construction.

Claim 1 is a method "comprising the step of division of said channel into sub-channels and transmitting said data from said data sensors respectively through said sub-channels accordingly, characterized by…." (Ex. A at col. 7:30-36). Neither the steps described in claim 1 nor the characterization of the steps require using a "data processing means." (*Id.* at col. 7:33-42). Claim 12 is a claim directed to an "apparatus for wireless transmission of data" "comprising a multiplexer adapted to effect division of said communications channel into sub-channels, and a transmitter adapted to transmit said data through said sub-channels accordingly; characterized by…." (Ex. A at col. 8:20-26). The apparatus of claim 12 must be capable of transmitting data from the sensors in a particular manner, however the apparatus does not require a data processing means. "Data processing means" is used solely in the preambles of claims 1 and 12, and does not "constitute or explain a claim limitation" and is "not necessary to give life, meaning and vitality to the claim[s]." *Altiris, Inc. v. Symantec Corp.*, 318 F. 3d 1363, 1371 (Fed.Cir. 2003).

Even if the Court were to find that "data processing means" is a limitation, Defendants' proposed construction is narrower than the disclosures in the specification. The specification describes data processing means that are not limited to "personal computers or workstations configured to receive decoded sensor data." Instead, the specification describes "data processing means" as computers, controllers, microcontrollers, circuits, and workstations that receive raw data, partially pre-processed data, or totally processed data from sensors for further processing. (Ex. A at Abstract, col. 1:23-29; col. 4:41-45; col. 5:15-17, 22-33; col. 6:7-11, 17-25; Fig. 1 (24, 38, 40)). Furthermore, the data processing means is not limited to "provid[ing] [data] to virtual serial ports for analysis and/or display." The specification describes data processing means

13

providing the received raw data, partially pre-processed data, or totally processed data for analysis, displaying, data stream decoding, signal conditioning, duplexing, multiplexing, signal conversion from analog to digital, allocating to virtual serial ports, and preparing data for further transmission or routing.  (Ex. A at col. 1:30-34, 51-54; col. 4:41-45, 56-60; col. 5:8-17, 28-34, 38-42, 53-59; col. 6:1-25, 41-46; Figs. 1-6).  Defendants' proposed construction is too narrow and therefore incorrect.

### E.    "Channel"/"Communications Channel" (Claims 1 and 12)

| Magnacross | Defendants |
|---|---|
| Plain and ordinary meaning. | a wireless information route between a single transmitter and a single receiver |

"Channel" and "communications channel" are used according to their plain and ordinary meaning and do not require construction.

Claim 1 is a method for the transmission of data and claim 12 is an apparatus for the transmission of data "through a communications channel from at least two data sensors to a data processing means."  The channel is divided asymmetrically into sub-channels such that the carrying capacities of the sub-channels are unequal.  The specification explains that channels have bandwidth for the transmission of information, and data can be allocated to sub-channels of the channel on different bases including on a time-division, frequency, or packet-switching division basis.  (*e.g.*, Ex. A at col. 3:36-43, 59-62). The term "channel" and "communications channel" are used according to their plain and ordinary meaning in the art, which is consistent with the ordinary meaning.  Defendants also agree that the terms should be accorded their plain and ordinary meaning by relying on a dictionary definition to support their proposed construction.  (Dkt. No. 166-2 (PR 4-3 Joint Statement) at Ex. B at 2).  The term "channel" and "communications channel" are used according to their plain and ordinary meaning in the art,

which is consistent with the ordinary meaning.   "Channel" and "communications channel" therefore do not require construction.

Defendants' proposed construction is incorrect for several reasons.   Defendants imply that the terms must be solely "wireless."   However, although the "communications channel" must be capable of handling "wireless transmission" of data, the "communications channel" can also in part include non-wireless transmission.   For example, the specification provides figures and describes how sub-channels are combined by circuitry before the wireless transmission of the data.   (Ex. A at col. 5:22-37; col. 6:11-15; Figs. 2-3, 4-5).   Defendants also seek to improperly limit the term to a preferred embodiment by contending that there can only be a single transmitter and a single receiver.   However, there is no clear intent to limit the communication channel to communication between a single transmitter and receiver.   *Thorner*, 669 F.3d at 1365.   Defendants' proposed construction is therefore incorrect.

### F.    "Sub-Channel" (Claims 1 and 12)

| Magnacross | Defendants | YiFang |
|---|---|---|
| Plain and ordinary meaning. | a sub-division of a wireless channel | an identifiable band of frequencies that is a subset of the communication channel frequencies. |

"Sub-channel" should be accorded its plain and ordinary meaning.

As explained in the claims, a "sub-channel" is a "division of [a] channel."  (Ex. A at col. 7:33-34; col. 8:24-25).   This is consistent with the specification that provides examples of a channel being divided into sub-channels.   (*e.g.*, Ex. A at col. 3:36-43; col. 5:22-27).   Because the claims already explain the construction of "sub-channel," which is consistent with the term's plain and ordinary meaning, no construction is required.

Defendants' proposed construction of a "sub-division of a wireless channel" is unnecessary and incorrect.   The issue of whether a "channel" is "wireless" is already addressed

15

in the arguments above regarding whether a "channel" or "sub-channel" must be wireless.  (*See* Section III(E)).  As explained above, neither the claim nor the specification require the channel to be entirely wireless.  (*Id.*; *e.g.*, Ex. A at col. 5:22-37).

YiFang's proposed construction is also incorrect because it is limited to a band of frequencies.  In the specification, channels are not limited to frequencies because channels can be divided by non-frequency division including by time-division and packet-switching.  (Ex. A at col. 3:36 – 62).  Dependent claims further support that a channel can be divided by manners other than frequency, such as time-division and packet-switching.   (Ex. A at col. 7:46-53 (dependent claims 2-4), col. 8:36-45 (dependent claims 13-15)).  YiFang's proposed construction is therefore incorrect.

### G.   "Division of Said [Communications] Channel into Sub-Channels" (Claims 1 and 12)

| Magnacross | Defendants |
| --- | --- |
| Plain and ordinary meaning. | creating a combined signal whose data carrying capacity is sub-divided |

"Division of said [communications] channel into sub-channels" is used according to its plain and ordinary meaning and does not require construction.

The claims are directed to the transmission of data through a communications channel. (Ex. A at col. 7:30-32, col. 8:20-22).  The invention requires a method step or apparatus for the "division of said [communication] channel into sub-channels."  (Ex. A at col. 7:32-33, col. 8:23-25).   The communication channel is divided "asymmetrically whereby the data carrying capacities of said sub-channels are unequal."  (Ex. A at col. 7:37-39, col. 8:27-29).  Dependent claims further limit the division of the channel into sub-channels to division on a frequency basis, time-division basis, or packet-switching basis.  (Ex. A at col. 7:46-53 (dependent claims 2-

16

4), col. 8:36-45 (dependent claims 13-15)).  The claims therefore already describe the division of the channel into sub-channels and, as a result, no construction is required.

The specification, like the claims, states that the channel is divided into sub-channels. (Ex. A at col. 2:65 – col. 3:2).  Examples of the division of the communication channel described in the specification include dividing the communications channel on a time-division basis, frequency-division basis, and packet-switching basis.  (Ex. A at col. 3:36 – 62).  Figures are also provided of devices that can implement the division of the communication channel.  (Ex. A at Figs. 2-5).  The disclosures of the specification are therefore consistent with the claim language that divides a channel into sub-channels asymmetrically so that the carrying capacities of the sub-channels are unequal.  (*e.g.*, Ex. A at col. 2:65 – col. 3:2; col. 5:22-27; col. 6:29-35). Because the term is clear and understandable according to its plain and ordinary meaning, no construction is required.

Defendants' proposed construction is inconsistent with Defendants' other proposed constructions.  Defendants propose constructions for "channel" and "sub-channel," yet their proposed construction for "division of said [communications] channel into sub-channels" drops any reference to a channel or sub-channel, and does not incorporate their proposed construction of "channel" and "sub-channel."  For example, Defendants' proposal implies that "channel" should be construed to be a "combined signal," yet Defendants' proposed construction for "channel" is "a wireless information route."  (*See* Section III(E)).  Furthermore, focusing on the claim term "division," it appears that Defendants construe "division" to mean "creating," which makes little sense and is not consistent with the disclosure in the specification.  Defendants' proposed construction is therefore incorrect.

**H.**  **"Allocating Data From Said Local Data Sensors to Respective Ones or Groups of Said Sub-Channels in Accordance with the Data Carrying Capacities of Said Sub-Channels" / "Allocating of Data From Said Local Data Sensors to Respective Ones or Groups of Said Sub-Channels in Accordance with…Data Rate Requirements From Said Local Sensors" (Claims 1 and 12)**

| Magnacross | Defendants |
|---|---|
| Plain and ordinary meaning. | allocating [allocate] data from each sensor to one or more sub-channels whose data carrying capacity closely matches that sensor's data rate requirements |

The "allocating" terms are clear and unambiguous and therefore should be accorded their plain and ordinary meaning.

The claims describe how the allocating occurs.  Claim 1 requires that the channel is divided asymmetrically so that the data carrying capacities of the sub-channels are unequal.  (Ex. A at col. 7:37-39).  Claim 1 also requires that the data rate required for the data transmission from the sensors differ substantially between at least two sensors.  (Ex. A at col. 7:40-42).  Then, as stated in the disputed term, claim 1 requires allocating data from the sensors to ones or groups of sub-channels in accordance with the data carrying capacities of the sub-channels.  (Ex. A at col. 7:43-45).  Similarly, claim 12 requires a multiplexer adapted to divide the channel asymmetrically so that the data carrying capacities of the sub-channels are unequal.  (Ex. A at col. 8:27-29).  Claim 12 also requires a control means that can allocate data from the sensors to ones or groups of sub-channels in accordance with the substantially different data rate requirements from the sensors.  (Ex. A at col. 8:31-35).  The "allocating" terms therefore use clear language in view of the remainder of the claim language.

The specification also describes the allocation of the data to the sub-channels.  The division of the sub-channels can occur such that the carrying capacities of the sub-channels far more closely match the data rate requirements of the sensors than the prior systems, or can

18

comfortably match the data rate requirements of the sensors.  (Ex. A at col. 3:28-35, col. 5:59-64).  Furthermore, rather than allocating data from a high data rate sensor to one sub-channel, the data may be allocated to a group of sub-channels to accommodate a high data rate requirement. (Ex. A at col. 6:51-57).  In general, the data is allocated to sub-channels such that more band width is allocated to sensors with more band width requirements.  (Ex. A at col. 5:22-27).  The disclosures of the claims and specification are consistent with the ordinary meaning of the "allocating" terms and therefore no construction of the terms is required.

Defendants' proposed construction does not construe the claim language and instead seeks to read preferred embodiments into the claim.  The claims do not have any language that would require that one or groups of sub-channels have a data carrying capacity that "closely matches" that sensor's data rate requirements.  Claim 1 only requires that a "communications channel is effected asymmetrically whereby the data carrying capacities of said sub-channels are unequal," that the "data rates required for data transmission from said local sensors differ[s] substantially between said at least two sensors" and therefore the sensor data is allocated to "ones or groups of said sub-channels in accordance with the data carrying capacities of said sub-channels."  (Ex. A at col. 7:36-45).  Claim 12 only requires that data is allocated from the sensors "to respective ones or groups of said communications sub-channels in accordance with substantially different data rate requirements from said local sensors."  (Ex. A at col. 8:31-35). There is no requirement for the sub-channels data carrying capacity "closely match" a sensor's data rate requirements.

Instead, Defendants are relying on non-limiting embodiments disclosed in the specification.  (*See* Dkt. No. 166-2, Ex. B at 2 (*citing* '304 patent at col. 3:28-35, 5:22-27, 5:57-64, 6:26-35).  *Phillips,* 415 F.3d at 1316 ("[a]lthough the specification often describes very

specific embodiments of the invention," it is improper to "confin[e] the claims to those embodiments."); *see also Liebel-Flarsheim,* 358 F.3d at 906.   However, those portions of the specification do not limit, nor any other portion of the specification limit, allocating data to sub-channels whose data carrying capacity "closely match" that sensor's data rate requirements.   For example, other portions of the specification more generally describe that the allocation is more general in that "more bandwidth [is allocated] for greater bandwidth requirement[s]," (Ex. A at col. 5:22-27; *also* col. 6:51-57), rather than the allocation "closely matching" the sensor's data rate requirements.   In fact, the specification does not describe that the sub-channel carrying capacities "closely match" the sensors' data rate requirements.   Instead, the specification uses that phrase in the context of a comparison to the prior art by stating that the data flow is "***far more*** closely matched to the available capacity of the sub-channel" to avoid over- or under-utilization.   (Ex. A at col. 3:32-35) (emphasis added).   Rather than closely match, the specification goes on to state that the band width of the sub-channel may "comfortably accommodate the data rate requirements" of the data stream.   (Ex. A at col. 5:59-64). Defendants' proposed construction is therefore incorrect.

### I.        "Control Means" (Claim 12)

| Magnacross | Defendants |
|---|---|
| Claim term is not governed by 35 U.S.C. §112(6). <br><br> If the term is found to be governed by 35 U.S.C. §112(6), the structure is a "computer, microprocessor, or circuit designed or programmed to allocate data from sensors to sub-channels such that data from sensors with higher data rate requirements are allocated to sub-channels with higher data rate capacities and data from sensors with lower data rates requirements are allocated to sub-channels with lower data rate capacities and equivalent structures." | controller (under § 112 ¶ 6) |

"Control means" is not in means-plus-function form because the claim discloses a sufficiently definite structure to a person of ordinary skill in the art to rebut the presumption of means-plus-function form.  *Apple*, 757 F.3d at 1296.

Claim 12 describes the multiplexer as having a control means that is "adapted to allocate data from said local data sensors to respective ones or groups of said communications sub-channels in accordance with substantially different data rate requirements from said local sensors." (Ex. A at col. 8:31-35).  The specification describes that the multiplexer is a computer, microprocessor, or circuit and therefore the control means that functions with the multiplexer would likewise be a computer, microprocessor, or circuit.  (*See*, *e.g.*, Ex. A at col. 6:1-25; Figs. 1, 2, 4).  Because there is a sufficient definite structure disclosed in the claims, the term should not be construed to be in means-plus-function form.

Even if the Court were to find that "control means" is in means-plus-function form, the specification discloses a broader structure than proposed by Defendants.  Defendants' contend that the specification only describes the control means as a "controller."  However, the specification describes other structures that perform "allocat[ing] data from said local data sensors to respective ones or groups of said communications sub-channels in accordance with substantially different data rate requirements from said local sensors."  For example, the specification discloses that allocation can be performed using a circuit, a microprocessor or microcontroller, or a computer. (Ex. A at Fig. 2 (64); col. 6:1-16, 29-35; Figs, 2(64), 4). Furthermore, consistent with the claim language, the specification discloses that the computer, microprocessor, or circuit are designed or programmed to allocate data from sensors to one or more sub-channels such that data from sensors with higher data rate requirements are allocated to one or a group of sub-channels with higher data rate capacities and data from sensors with lower

21

data rates requirements are allocated to one or a group of sub-channels with lower data rate capacities.  (Ex. A at col. 5:29-34, 55-59; col. 6:11-15, 29-35, 51-57; col. 8:31-35; Figs. 2, 4). Defendants' proposed construction is therefore narrower than the disclosures in the specification.

### J.      "Transmit" and "Transmission" (claims 1 and 12)

| Magnacross | Defendants |
|---|---|
| Plain and ordinary meaning. | send/sending |

"Transmit" and "transmission" are used according to their plain and ordinary meaning and therefore do not require construction.

Claim 1 claims a "method of wireless transmission of data" and requires "transmitting said data from said data sensors respectively through said sub-channels" and that "the data rate required for data transmission from said local sensors differing substantially between said at least two sensors."  (Ex. A at col. 7:30, 34-35, 40-42).  Dependent claim 6 requires that the "wireless transmission of data be[ ] effected at radio frequencies."  Claim 12 claims an "Apparatus for wireless transmission of data" and requires a "transmitter adapted to transmit said data through said sub-channels."  (Ex. A at col. 7:30; col. 8:20).

The term "transmission" is used extensively throughout the specification.  For example, it is used in the context of "wireless transmission of data," a "wireless transmission system," a "transmission route," a "wireless data transmission link," "transmission speed," "transmission sub-channels," and "radio frequency transmission."  (*e.g.*, Ex. A at col. 1:5, 62-63; col. 2:4, 38, 54; col. 3:6; col. 4:1-2).  The term "transmit" is used in the specification in the context of the "receive/transmit unit," "receive/transmit function," and sensors "transmitting their data"  (Ex. A at col. 1:25, 37, col. 4:63; col. 5:3).  Each of these uses are consistent with the claims and the well understood ordinary meaning of the terms "transmit" and "transmission."  No construction is therefore necessary.

Defendants substitute "send"/"sending" for "transmit"/"transmission."   However, the patent-in-suit or the prosecution history never use "send"/"sending."  The proposed constructions that substituting words do not make the terms any more understandable and do not make sense in view of the specification.   For example, substituting "send"/"sending" for "transmit"/"transmission" would result in the following awkward phrases in the specification: "wireless [sending] of data," "wireless [sending] system," "[sending] route," "wireless data [sending] link," "[sending] sub-channels," or "radio frequency [sending]."   Defendants' proposed construction is therefore not correct.

### K.    "Transmitting Said Data From Said Data Sensors Respectively Through Said Sub-Channels Accordingly" (Claim 1)/"Transmitter Adapted to Transmit Said Data Through Said Sub-Channels Accordingly" (Claim 12)

| Magnacross | Defendants |
|---|---|
| Plain and ordinary meaning. | [sending][transmitter adapted to send] the combined signal comprising the sensor data |

These terms should be accorded their plain and ordinary meaning.

The term from claim 1, "transmitting said data from said data sensors respectively through said sub-channels accordingly," is further described in the claim.  Claim 1 explains the step at issue as requiring "allocating data from said local data sensors to respective ones or groups of said sub-channels in accordance with the data carrying capacities of said sub-channels."  (Ex. A at col. 7:43-45).  So, as already stated in the claim, claim 1 requires transmitting data from the data sensors that is allocated to one or groups of sub-channels according to the data carrying capacities of the sub-channels.  Because the disputed term is further elaborated upon in the claim, no construction is required.

The related term in Claim 12, "transmitted adapted to transmit said data through said sub-channels accordingly" is likewise explained later in the claim.  Claim 12 explains that the controls means is "adapted to allocate data from said local data sensors to respective ones or

groups of said communications sub-channels in accordance with the substantially different data rate requirements from said local sensors."  (Ex. A at col. 8:31-35).  Again, as already stated in claim 12, the claim requires allocating data from the data sensors to ones or groups of sub-channels according to the substantially different data rate requirements of the sensors.  Because the disputed term is further elaborated upon in the claim, no construction is required.

Defendants' proposed construction is inconsistent with their other proposed constructions.  The terms both describe data transmitted through "sub-channels."  Although Defendants propose a construction for "sub-channel," (Section III(F)), their proposed construction for this longer transmitting/transmitter phrase drops any reference to "sub-channels."  Instead, Defendants use the phrase "combined signal," which is a phrase they substitute for the word "channels" in another term (Section III(G)), but which is still different from Defendants' proposed construction of "channels."  (*See* Section III(E)).  As explained above, Defendants also inappropriately substitute "send[ing]" for "transmit[ting]."  (*See* Section III(J)).  Defendants' proposed constructions are therefore incorrect.

### L.    Data Rate "Differing Substantially" / "Substantially Different" Data Rate (Claims 1 and 12)

| Magnacross | Defendants |
|---|---|
| Plain and ordinary meaning. | Indefinite. |

Defendants' argument that "differing substantially" and "substantially different" are indefinite is not supported by the case law or intrinsic evidence.

"[T]he term 'substantially' is a descriptive term commonly used in patent claims to 'avoid a strict numerical boundary to the specified parameter.'"  *Verve, LLC v. Crane Cams, Inc.*, 311 F.3d 1116, 1120 (Fed.Cir. 2002) (*quoting Ecolab Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed.Cir. 2001) (*quoting Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1217

(Fed.Cir. 1995))).   Expressions such as "substantially" "indeed may be necessary in order to provide the inventor with the benefit of his invention."   *Verve*, 311 F.3d at 1120.   "It is well established that when the term 'substantially' serves reasonably to describe the subject matter so that its scope would be understood by persons in the field of the invention, and to distinguish the claimed subject matter from the prior art, it is not indefinite."   *Id.*

In the claims, the terms "differing substantially" and "substantially different" refer to differences in the data rates of at least two sensors.  (Ex. A at col. 7:40-42, col. 8:33-35).  The invention improves the data transmissions from sensors with substantially different data rates such that there is an advantage to allocating unequal sub-channel capacities to handle the sensors' data transmissions.  (*e.g.*, Ex. A at col. 1:57 – col. 2:1; col. 2:5-13).  As explained in the prosecution history, there would be no reason for a division of "a communication channel into sub-channels having different data-carrying capacities" if "data is transmitted from sensors having the same data rates."  (Ex. F at MAG000037).  If sensors had the same data rate requirements, then sub-channels with the same data-carrying capacities would be sufficient.  Furthermore, sensors described as having merely "different" data rate requirements may also not benefit from sub-channels having different data-carrying capacities if the data rate requirements are only insubstantially different.   The terms "differing substantially" and "substantially different" are therefore used to distinguish (a) sensors that may have insubstantially different data rates and therefore could use channels with the same data-carrying capacity from (b) sensors with substantially different data rates such that unequal sub-channels will reduce over- or under-capacity in the system.   The scope of the terms "differing substantially" and "substantially different" is therefore not indefinite because they are necessary to secure the benefit of the scope

of the invention and a person skilled in the art would understand the scope of the claims.  *Verve*, 311 F.3d at 1120.

### M.    "Multiplexer" (Claim 12)

| Magnacross | YiFang |
|---|---|
| Plain and ordinary meaning. | a device that selects one of several input signals and forward the selected input to a single line. |

"Multiplexer" is described in claim 12 consistent with its plain and ordinary meaning and therefore does not require construction.

Claim 12 states that the "multiplexer [is] adapted to effect division of said communications channel into sub-channels." (Ex. A at col. 8:23-24).  Claim 12 also requires that the multiplexer has a control means that can "allocate data from said local data sensors to respective ones or groups of said communications sub-channels in accordance with substantially different data rate requirements from said sensors." (*Id.* at col. 8:31-35).  Dependent claims require that the "multiplexer" effect multiplexing on a frequency basis, time-division basis, or packet-switching basis. (*Id.* at col. 8:36-45).

The specification discloses the same information regarding multiplexing, which was known in the prior art. (*Id.* at col. 2:49-54).  The multiplexing system divides the communications channel on a time-division basis, frequency basis, or packet-switching basis to allocate data from the sensors to one or groups of sub-channels. (*Id.* at col. 2:65 – col. 3:2; col. 3:28-32, 36-43, 54-62; col. 4:30-35; col. 5:43-46; col. 6:3-7, 11-15; Figs. 2-5).  Because claim 12 already describes the multiplexer, which is consistent with its plain and ordinary meaning, no construction is required.

YiFang's proposed construction is inconsistent with claim 12.  YiFang's proposed construction disregards that claim 12 requires that the multiplexer "effect division of said

26

communications channel into sub-channels."  Furthermore, YiFang attempts to rewrite language in claim 12 ("allocate data from said local data sensors to respective ones or groups of said communications sub-channels") as "selects one of several input signals and forward the selected input to a single line," when the claim language is more clear than YiFang's proposal.  YiFang's proposed construction is therefore not correct.

## CONCLUSION

For the reasons stated above, Magnacross respectfully requests that the Court construe the terms as proposed by Magnacross and find that no terms are indefinite.


Dated:  March 11, 2016                    Respectfully submitted,

                                By:  */s/David R. Bennett*
                                      David R. Bennett
                                      Direction IP Law
                                      P.O. Box 14184
                                      Chicago, IL 60614-0184
                                      Telephone: (312) 291-1667
                                      e-mail:  dbennett@directionip.com
                                      **ATTORNEY FOR**
                                      **PLAINTIFF MAGNACROSS LLC**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on March 11, 2016, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Rule CV-5(a)(3).

*/s/David R. Bennett*
David R. Bennett