**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| **MAGNACROSS LLC** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **CELLCO PARTNERSHIP d/b/a T-MOBILE** | § | **CIVIL ACTION NO. 2:15-CV-844** |
| | § | **(Lead Consolidated Case)** |
| | § | |
| **T-MOBILE USA, INC.** | § | **CIVIL ACTION NO. 2:15-CV-854** |
| | § | |
| **Defendant.** | § | |

**<u>DEFENDANT T-MOBILE USA, INC.'S RESPONSIVE CLAIM CONSTRUCTION
BRIEF</u>**

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    LEGAL STANDARD...........................................................................................2

III.   THE ASSERTED CLAIMS .................................................................................3

IV.   CONSTRUCTION OF CLAIM TERMS .............................................................4

     A.     Preambles ...............................................................................................4

     B.     "Data Sensors" ......................................................................................7

     C.     "Local Data Sensors"/"Said Local Sensors"........................................8

     D.     "Data Processing Means" ...................................................................11

     E.     "Channel"/ "Communications Channel" ............................................13

     F.     "Sub-Channel" ....................................................................................15

     G.     "Allocating Data From Said Local Data Sensors to Respective Ones or Groups of Said Sub-Channels in Accordance with the Data Carrying Capacities of Said Sub-Channels" / "Allocating of Data From Said Local Data Sensors to Respective Ones or Groups of Said Sub-Channels in Accordance with…Data Rate Requirements From Said Local Sensors" ..............15

     H.     Data Rate "Differing Substantially" / "Substantially Different" Data Rate ..........17

V.    CONCLUSION...................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Astute Technology, LLC v. Learners Digest Int'l LLC*,
No. 2:12-CV-689-JRG, 2014 U.S. Dist. LEXIS 45526 (E.D. Tex. April 2,
2014)
.............................................................................................................................3

*Bicon, Inc. v. Straumann Co.*,
441 F.3d 945 (Fed. Cir. 2006)..............................................................................6

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
289 F.3d 801 (Fed. Cir. 2002)..............................................................................5

*Eaton Corp. v. Rockwell Int'l Corp.*,
323 F.3d 1332 (Fed. Cir. 2003)........................................................................5, 7

*Endo Pharmaceuticals Inc. v. Watson Labs., Inc.*,
No. 2:13-CV-192-JRG, 2014 U.S. Dist. LEXIS 84804 (E.D. Tex. June 23,
2014) .....................................................................................................................3

*Light Transformation Techs. LLC v. General Electric Co.*,
No. 2:12-cv-826-MHS-RSP, 2014 U.S. Dist. LEXIS 94090 (E.D. Tex. July
10, 2014) .............................................................................................................10

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
382 F.3d 1354 (Fed. Cir. 2004)..........................................................................11

*Mangosoft, Inc. v. Oracle Corp.*,
525 F.3d 1327 (Fed. Cir. 2008)............................................................................9

*Mangosoft, Inc. v. Oracle Corp.*,
No. 02–CV–545, 2004 WL 2193614, slip op. (D.N.H. Sept. 21, 2004)...................9

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. __, 134 S. Ct. 2120, 189 L. Ed. 2d 37, 2014 U.S. LEXIS 3818
(2014) ........................................................................................................ *passim*

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc)............................................................2

*In re TR Labs Patent Litig.*,
No. 09-3883-PGS-DEA, 2014 U.S. Dist. LEXIS 95185 (D.N.J. July 14, 2014) ...................10

*TriMed, Inc. v. Stryker Corp.*,
514 F.3d 1256 (Fed. Cir. 2008)..........................................................................................11

*Triton Tech of Texas, LLC v. Nintendo of America, Inc.*,
No. 2013-1476, 2014 U.S. App. LEXIS 10997 (Fed. Cir. June 13, 2014)...........................2, 3

*Verve, LLC v. Crane Cams, Inc.*,
311 F.3d 1116 (Fed. Cir. 2002)..........................................................................................18

**Statutes**

35 U.S.C. §112.............................................................................................................2, 11

**Other Authorities**

M.P.E.P. 2173.05(e)............................................................................................................7

Local Patent Rule 4.5(b) ....................................................................................................1

Pursuant to the Local Patent Rule 4.5(b) and this Court's Amended Docket Control Order (Dkt. No. 67), Defendant T-Mobile USA, Inc. ("Defendant" or "T-Mobile") hereby submits this Responsive Claim Construction Brief.

## I.  INTRODUCTION

U.S. Patent No. 6,917,304 (the "'304 Patent."), titled "Wireless Mutliplex [sic] Data Transmission System," was originally filed as a foreign patent application on April 3, 1997 and issued as a U.S. Patent on July 12, 2005.[1]  The '304 Patent pertains to methods and apparatuses for the wireless transmission of data through a communications channel from at least two local data sensors to a data processor.  *See* Ex. A, '304 Patent at Col. 1, ll. 4-7.  The '304 Patent was an attempt to improve on certain perceived shortcomings in conventional methods of transmitting data from data sensors to a data processor.  For example, the '304 Patent described that prior art methods involving certain cables and wiring limited the effectiveness and convenience of the data transmission.  *Id*. at Col. 1, ll. 37-40.  Therefore, the '304 Patent describes a method for wirelessly transmitting data from a transmitter to a receiver via various wireless communication channels.  *See id*. at Col. 1, ll. 51-54; Col. 2, ll. 5-8; Figs. 1-6.  For example, the '304 Patent describes one exemplary embodiment wherein automotive diagnostic sensors gather data from a vehicle then communicate that information via antennas to a nearby workstation or personal computer.  *See id.* at Col. 4, ll. 46-60, Fig. 6.

The '304 Patent also discusses the desire to more effectively allocate data flows to communication channels in an effort to avoid over- and underutilization.  *Id*. at Col. 3, ll. 32-35. For example, the '304 Patent describes transmitting data from data sensors with substantially different data rates over an asymmetrically divided communication channel.  *See id.* at Col. 7, ll.

---

[1] A copy of the '304 Patent is attached as Exhibit A.

30-45; Col. 8, ll. 20-35.  In so doing, data flows are allocated such that the respective data flows from the sensors are allocated to one or more of the sub-channels based on the data carrying capacities of the sub-channels.  *Id*.  This process results in data flow that is "far more closely matched to the available capacity of the sub-channel" to avoid over- or underutilization.  *Id.* at Col. 3, ll. 32-35.  Other aspects of the '304 Patent are addressed in the claim construction analysis below.

## II.  LEGAL STANDARD

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  To ascertain the scope and meaning of the asserted claims, the court looks to the words of the claims themselves, the specification, the prosecution history, and, lastly, any relevant extrinsic evidence. *Id.* at 1315-17.  Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent.  *Id.* at 1312-13.  "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  A patentee may define terms, give a term a different meaning than it would otherwise possess, or disavow claim scope in the specification.  *Phillips*, 415 F.3d at 1316.  In these situations, the inventor's lexicography governs.  *Id.*

35 U.S.C. §112 ¶ 6 of the patent laws allows a patentee to express an element of a claim as a means for performing a function.  *See Triton Tech of Texas, LLC v. Nintendo of America, Inc.*, No. 2013-1476, 2014 U.S. App. LEXIS 10997 at *5 (Fed. Cir. June 13, 2014) (citing 35 U.S.C. §112 ¶ 6 (2006)).  However, in exchange for using this means-plus-function language, the

patent specification must disclose "with sufficient particularity the corresponding structure for performing the claimed function and clearly link that structure to the function." *See id*. (citing *Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*, 732 F.3d 1376, 1379 (Fed. Cir. 2013)).  "The question is not whether one of skill in the art would be capable of implementing a structure to perform the function, but whether that person would understand the written description itself to disclose such a structure." *Astute Technology, LLC v. Learners Digest Int'l LLC*, No. 2:12-CV-689-JRG, 2014 U.S. Dist. LEXIS 45526 at *17 (E.D. Tex. April 2, 2014) (quoting *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1338 (Fed. Cir. 2008)).  Further, the structure must be described in detail, not in the abstract, and must be more than a "black box."  *See id*. (citing *Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d 1371, 1382-83 (Fed. Cir. 2009)).

A claim is indefinite if the "claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *See Endo Pharmaceuticals Inc. v. Watson Labs., Inc.*, No. 2:13-CV-192-JRG, 2014 U.S. Dist. LEXIS 84804 at *25-26 (E.D. Tex. June 23, 2014) (quoting *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. __, 134 S. Ct. 2120, 189 L. Ed. 2d 37, 2014 U.S. LEXIS 3818, *6 (2014)).  "It cannot be sufficient that a court can ascribe *some* meaning to a patent's claims; the definiteness inquiry trains on the understanding of a skilled artisan at the time of the patent application, not that of a court viewing matters *post hoc*."  *Nautilus*, 134 S. Ct. at 2130 (emphasis in original).

### III.  THE ASSERTED CLAIMS

Plaintiff Magnacross LLC ("Plaintiff" or "Magnacross") asserts Claims 1 and 12 of the '304 Patent (the "Asserted Claims").  For the Court's convenience, the text of the Asserted Claims of the '304 Patent, with the terms T-Mobile argues are indefinite shown in highlight, is attached as Exhibit B.

## IV.  CONSTRUCTION OF CLAIM TERMS

As a preliminary matter, a number of the named defendants have recently been dismissed from this case.[2]  As a result of these dismissals, the parties have agreed to apply "plain and ordinary meaning" for the following terms:

- "division of said [communications] channel into sub-channels" (claims 1 and 12)

- "control means" (claim 12)

- "transmit" and "transmission" (claims 1 and 12)

- "transmitting said data from said data sensors through said sub-channels accordingly" and "transmit said data through said sub-channels accordingly" (claims 1 and 12)

The parties still dispute the proper construction of a number of terms discussed below. For the Court's convenience, T-Mobile has addressed each disputed term in the order presented in Plaintiff's Opening Claim Construction Brief (Dkt. No. 204) ("Opening Brief"), beginning with the preambles of the Asserted Claims.

### A.    Preambles

- "1. A method of wireless transmission of data in digital and/or analogue format through a communications channel from at least two data sensors to a data processing means"

- "12. Apparatus for wireless transmission of data in digital and/or analogue format through a communications channel from at least two local data sensors to a data processing means"

| Plaintiff's Construction | T-Mobile's Construction |
|---|---|
| The preambles are not a limitation. | The preambles are a limitation. |

The parties dispute the need to construe the preambles of the Asserted Claims.  T-Mobile contends that the preamble should be construed as limiting for at least three reasons.  First, the

---

[2] Neither T-Mobile nor Plaintiff seek construction of the term "multiplexer" which appears in claim 12 of the '304 Patent.  Defendant YiFang USA, Inc. requested construction of that term.

preamble provides the essential features of the claimed invention and breathes life into the claims.  Second, the preamble recites the essential and necessary structure of the claimed method and apparatus.  Finally, the preamble provides antecedent basis for a number of recurring terms in the claims.

The preamble should be construed as limiting "if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim."  *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808, 808-09 (Fed. Cir. 2002).  The Federal Circuit has also ruled that the preamble can be limiting when elements in the preamble serve as an antecedent basis for limitations in the claim body.  *See Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332 (Fed. Cir. 2003).

Here, the preambles are necessary to give life, meaning and vitality to the Asserted Claims.  In particular, the preambles recite essential features of the Asserted Claims and claim limitations, and indeed, of the method and apparatus described in the specification.  The pervasive use of the term "wireless" in the Title, Abstract, Background and preamble of all Asserted Claims demonstrates the drafter's intent to describe an apparatus and method for wireless transmission of data.  Specifically, the '304 Patent explains that earlier methods of data transmission were burdened by the inclusion of intrusive cables connecting the various system components.  *See* '304 Patent at Col. 1, ll. 37-40 ("Conventionally, the data is transmitted from the data sensors to the data processing function via conventional conductors or cables which impose obvious inconveniences and limitations on the convenient operation of the equipment").

Further, the '304 Patent describes improvements beyond merely removing these cords, namely that:

> "Various attempts have been made to achieve effective wireless transmission of data between automotive data sensors and a

> corresponding data processing and/or display function but these have been relatively unsuccessful. [. . .] Accordingly, we have identified a requirement for a method and apparatus for the wireless transmission of data through a communications channel from at least two local data sensors with optional primary data processing to a data processing function, offering improvements in relation to prior proposals in this field, notably in relation to the bandwidth requirement and/or related functions attendant on the simultaneous transmission of data from a multiplicity of such local sensors."

*See* the '304 Patent, Col. 1, ll. 51-54, Col. 2, ll. 5-8.  These distinctions from known prior art indicate that the essence of the Asserted Claims is improving and advancing *wireless* transmission methods.  Thus, the language of the preambles is necessary to give life, meaning and vitality to the claims.

The preambles also provide the requisite structure for the method and apparatus recited in the Asserted Claims.  In particular, the preambles recite "a method of [or apparatus for] wireless transmission of data in digital and/or analogue format *through a communications channel from at least two data sensors to a data processing means.*" *See* '304 Patent at Claims 1, 12 (emphasis added).  This is not merely recitation of one possible embodiment or intended purpose of the claims.  Instead, it is the fundamental structure for the alleged invention.  *See, e.g.*, *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 952 (Fed. Cir. 2006) (holding preamble limiting because it "recites essential elements of the invention pertaining to the structure of the [claimed apparatus.]").

Finally, the preambles of the Asserted Claims provide the only antecedent basis for certain claim elements recited throughout the Asserted Claims.  In particular, the preambles of the Asserted Claims introduce and provide the antecedent basis for the terms "communications channel," "at least two data sensors," and "data processing means."  Without the benefit of the preamble, these terms would lack proper antecedent basis and should have been rejected during

prosecution of the '304 Patent.  *See* M.P.E.P. 2173.05(e).  The Federal Circuit has held that when limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention.  *See Eaton Corp*., 323 F.3d at 1339.  For at least these reasons, the preambles of the Asserted Claims should be deemed limiting.

### B.    "Data Sensors"

| "Data Sensors" (Claims 1 and 12) | |
| --- | --- |
| Plaintiff's Construction | T-Mobile's Construction |
| "sensors that may transmit raw data for subsequent processing or may incorporate some degree of primary data processing whereby the data received at the main processor is partially or totally preprocessed, or raw data" | No construction necessary. |

Plaintiff's proposed construction of "data sensors" should be rejected for at least three reasons.  First, Plaintiff's suggestion that the term "data sensors" – a term which first appears in the preamble of the Asserted Claims – should be construed contradicts Plaintiff's argument that the preambles are not limiting.  Second, Plaintiff fails to show that the term "data sensors" requires construction to avoid jury confusion.  Third, the '304 Patent's specification does not define the term "data sensors," as Plaintiff incorrectly contends.

Plaintiff continues to argue that the preambles of the Asserted Claims are not limiting. However, the term "data sensor" – which Plaintiff suggests requires construction – is first introduced in the preambles.  These positions are plainly inconsistent and confusing.  In particular, Plaintiff is suggesting – without citing any authority – that the term "data sensor" have

a specific meaning at some locations in the Asserted Claims, but not when that term is introduced in the preambles.

Furthermore, the term "data sensors" is sufficiently understandable to a lay juror and does not require any construction.  In fact, implementing Plaintiff's lengthy construction will only serve to confuse the jury by introducing abstract phrases such as "raw data," "some degree of primary data processing," "received at the main processor" and "partially or totally preprocessed."  None of these actions or structures appear in the language of the Asserted Claims.  Instead, Plaintiff relies solely on the specification to read these limitations into the term "data sensors."

It is no answer for Plaintiff to argue that the term "data sensors" is defined in the specification.  The pertinent portion of the specification relied on by Plaintiff discusses the term "*local* data sensors."  *See* Plaintiff's Opening Br. at 11 (citing '304 Patent at Col. 1, ll. 23-29) ("In this specification and the claims, references to *local data sensors* are to be interpreted in accordance with the following [. . .]") (emphasis added).  Although the terms "local data sensors" and "said local sensors" are discussed separately below, Plaintiff did not present proposed constructions for these terms.  Plaintiff now suggests that the term "data sensors" should be construed in light of the specification's discussion of "local data sensors," while the term "local data sensors" be given its plain and ordinary meaning.  For at least these reasons, Plaintiff's proposed construction of the term "data sensors" is incorrect and should be rejected.

C.      **"Local Data Sensors"/"Said Local Sensors"**

| **"Local Data Sensors"/"Said Local Sensors" (Claims 1 and 12)** | |
| --- | --- |
| Plaintiff's Construction | T-Mobile's Construction |
| Plain and ordinary meaning. | data sensors located nearby the data processing |

| | means (e.g., within the same room) |
|---|---|

For the reasons discussed above, T-Mobile does not request that the Court independently construe the term "data sensors" which should be given its plain and ordinary meaning.  Instead, T-Mobile requests that the Court construe the term "local" in the phrase "local data sensors."

As previously discussed, Plaintiff's claim construction positions regarding the terms "data sensors," "local data sensors," and "said local sensors" are inconsistent and confusing.  T-Mobile acknowledges that the specification discusses at least one interpretation of "local data sensors," however it is not proper to limit the claim language to this specific embodiment in this instance.  In particular, the specification further describes a number of additional functionalities and structural features for these "local data sensors."  *See* '304 Patent at Col. 2, ll. 5-13; Col. 4, ll. 46-55.  Courts have recognized the need to construe certain relative, vague terms such as "local" in the context of computer networking methods.  *See, e.g.*, *Mangosoft, Inc. v. Oracle Corp.*, No. 02–CV–545, 2004 WL 2193614, slip op. at 20 (D.N.H. Sept. 21, 2004).   In *Mangosoft*, the district court held that the word "local" when used to modify a computer device means a computer device (e.g., a hard drive) that is directly attached to a single computer's processor by, for example, the computer's bus.  *Id.*  In affirming the district court's construction the Federal Circuit noted that, based on the intrinsic record, applying a different construction for "local" would mean something beyond the breadth of anything in the claims or the specification.  *See Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327, 1330 (Fed. Cir. 2008).  T-Mobile does not suggest that this Court implement the same definition of "local" as found in the *Mangosoft* case.  However, as the *Mangosoft* ruling teaches, the term "local" is subject to many interpretations and must be read in context of the intrinsic record.

Plaintiff does not dispute that the intrinsic record of the '304 Patent discloses transmission of data across a room. *See* Opening Br. at 12. However, Plaintiff suggests that "other examples are silent as to how far the sensors are from the data processing means." *Id.* On these grounds, Plaintiff disagrees with T-Mobile's proposed construction. Instead, Plaintiff insists that the terms "local data sensors" and "said local sensors" have a "plain and ordinary meaning" in the art, but offers no evidence of what that meaning might be. Effectively, Plaintiff's argument implies that because the intrinsic record is silent as to the capabilities of the claimed method and apparatus, the Court should not read any limitation into the Asserted Claims. This suggestion misapplies the teachings of *Mangosoft* and presumes that claim terms can have a broader meaning than what is actually disclosed and enabled by the specification.

In addition, Plaintiff's reliance on the specification's silence coupled with Plaintiff's inability to ascribe any scope to the term "local" would render the Asserted Claims indefinite under recent Supreme Court precedent. Under *Nautilus*, a claim term is indefinite despite the disclosure of some guidance or suggestion of possible structure or scope, if the ultimate determination of claim scope is still not reasonably certain to a person skilled in the art. *See Nautilus*, 2014 U.S. LEXIS 3818 at *22. Recent cases following the guidance in *Nautilus* have found claims to be indefinite when the specification provided numerous potential examples of how to interpret a claim term but no clear direction as to scope. *See, e.g., Light Transformation Techs. LLC v. General Electric Co.*, No. 2:12-cv-826-MHS-RSP, 2014 U.S. Dist. LEXIS 94090 at *28-29 (E.D. Tex. July 10, 2014) (finding term "axis of light direction" indefinite where specification illustrated "numerous exemplary axes of light directions" but a person skilled in the art could not determine which exemplary axis was the "axis of light direction") and *In re TR Labs Patent Litig.*, No. 09-3883-PGS-DEA, 2014 U.S. Dist. LEXIS 95185 at *14-20 (D.N.J. July

14, 2014) (finding term "increases and optimizes demand served" indefinite where specification identified "host of possible constraints" but there was no specific criteria disclosed for performing claim element).  Here, as in the cases discussed above, Plaintiff suggests that despite evidence in the specification as to the meaning of "local," the Court should not construe the term. However, Plaintiff's proposal creates a boundless definition which contradicts the specification, renders the term indefinite, and will confuse the jury.  For these reasons, T-Mobile's construction should be adopted.

### D.    "Data Processing Means"

| "Data Processing Means" (Claims 1 and 12) | |
| --- | --- |
| Plaintiff's Construction | T-Mobile's Construction |
| Term is in the non-limiting preamble, so no construction is necessary. Otherwise, it [*sic*] used according to its plain and ordinary meaning. | personal computer or workstation configured to receive decoded sensor data and provide it to virtual serial ports for analysis and/or display (under § 112 ¶ 6) |

The claim term "data processing means," which appears in both Asserted Claims, is a means-plus-function claim limitation under 35 U.S.C. §112 ¶ 6 because it includes the term "means" and because sufficient structure to perform the function of displaying is not recited in the claim, including in the term "data processing."  The use of the term "means" triggers a rebuttable presumption that 35 U.S.C. §112 ¶ 6 applies to that term.  *See TriMed, Inc. v. Stryker Corp*., 514 F.3d 1256, 1259 (Fed. Cir. 2008).  This presumption may be rebutted if the claim recites sufficient structure to perform the recited function.  *See id*.  It may also be rebutted if the claim term is used "in common parlance" to designate a structure that performs the function.  *See Lighting World, Inc. v. Birchwood Lighting, Inc*., 382 F.3d 1354, 1359-60 (Fed. Cir. 2004).

Plaintiff's own arguments and evidence demonstrate that the presumption is not rebutted with regard to this term.

First, Plaintiff argues that the term "data processing means" is not limiting because it appears in the preambles of the Asserted Claims. However, this argument is improper for at least the reasons discussed above. *See supra* Section IV(A). For example, the term "data processing means" undisputedly provides the essential structure to the Asserted Claims. Without this limitation, the jury cannot – and will not – understand how the method or apparatus are used to wirelessly transmit data. In effect, the "data processing means" is the target of all wireless transmissions of data from the "data sensors." *See, e.g.*, Claim 1 ("A method of wireless transmission of data in digital and/or analogue format *through a communications channel from at least two data sensors to a data processing means*[.]") (emphasis added). Further, as discussed above, Plaintiff is proposing a limiting construction for the term "data sensors" which also appears for the first time in the preambles. This inconsistent strategy would result in some limiting terms and other non-limiting terms within the same preamble.

In addition, the Asserted Claims recite no structure that could perform the function of "data processing" as the claim requires, other than the "data processing means." The term "data processing" is not used commonly to refer to a structure for receiving and analyzing data. Plaintiff cites to portions of the specification to argue that electronic devices other than the "personal computer" or "workstation" are encompassed by the term. *See* Opening Br. at 13. Notably, however, these components are all referenced as parts of the "personal computer" or "workstation." *See* '304 Patent at Col. 4, ll. 41-45 ("As shown in FIG. 1, a system 10 for wireless transmission of data through a communications channel 12 between local data sensors 24, 16, 18, 20 and 22, and a *data-processing function or personal computer* 24, to receive data

therefrom, comprises the following main elements.") This understanding is further confirmed by Figures 1 and 6 of the '304 Patent. Finally, representative claim 5 recites the "data processing means comprising a host PC having a series of virtual serial ports." This evidence collectively affirms the structure in T-Mobile's proposed construction.

With respect to the functionality of the term "data processing means," the Asserted Claims explain that the "means" receives data through a communications channel from at least two data sensors. Further, the specification describes that the personal computer or workstation is configured to receive "the decoded data stream to respective virtual serial ports set up in the PC for data analysis and display purposes." *See* '304 Patent at Col. 6, ll. 24-25.

The structure proposed by T-Mobile is correct and based on the only structure for performing this function disclosed in the intrinsic evidence. T-Mobile's proposed construction accurately captures both the function and the structure for this means-plus-function claim term as they set forth in the Asserted Claims.

### E.    "Channel"/ "Communications Channel"

| "Channel"/ "Communications Channel" (Claims 1 and 12) | |
|---|---|
| Plaintiff's Construction | T-Mobile's Construction |
| Plain and ordinary meaning. | a wireless information route between a single transmitter and a single receiver |

Plaintiff primarily disputes T-Mobile's inclusion of the terms "wireless" and "between a single transmitter and single receiver." However, as discussed below, T-Mobile's proposed construction correctly applies the specification to help the jury understand an otherwise unreasonably broad term.

At numerous locations in its Opening Brief, Plaintiff acknowledges that the '304 Patent relates to the "wireless transmission of data." *See, e.g.*, Opening Br. at 2 ("A. The Patent-in-Suit is Directed to Improvements to *Wireless* Transmission of Data from Data Sensors with Different Data Rate Requirements") (emphasis added). In fact, the phrase "wireless transmission of data" appears 16 different times in Plaintiff's Opening Brief. Further, in describing the '304 Patent Plaintiff distinguishes from earlier, conventional methods of transmitting data based on the removal of "cables that put limitations on the convenience and operations of the equipment." *Id.* (citing '304 Patent at Col. 1, ll 37-40). Interestingly however, in its discussion of the terms "channel" and "communications channel," Plaintiff for the first time suggests that the transmission of data need not be wireless. This is incorrect and should be rejected.

As Plaintiff acknowledges, the alleged invention of the '304 Patent is the improvement upon and advancement of conventional *wireless* transmission methods. *See* '304 Patent at Col. 1, ll. 51-54, Col. 2, ll. 5-8. This understanding is confirmed by the pervasive use of the term "wireless" in the Title, Abstract, Background and preamble of all Asserted Claims. Further, as depicted in Figures 1 through 6, the only form of transmission contemplated in the '304 Patent is wireless. For example, Figure 1 depicts the general structure of the system wherein data is wirelessly communicated from a transmitter 34 to a receiver 36 via antennas 28, 30. This single transmitter 34 is depicted in further detail in Figures 2 and 4 while the single receiver 36 is depicted in further detail in Figures 3 and 5. Finally, a practical application of a single transmitter 106 wirelessly communicating data to a single receiver 116 is depicted in Figure 6.

The terms "communication channel" and "channel" are therefore properly construed as "a wireless information route between a single transmitter and a single receiver." As described above, the '304 Patent only describes wireless transmission of data through communication

channels from a single transmitter to a single receiver.  Plaintiff's arguments to the contrary are incorrect and should be rejected.

F.      "Sub-Channel"

| "Sub-Channel" (Claims 1 and 12) | |
| --- | --- |
| Plaintiff's Construction | T-Mobile's Construction |
| Plain and ordinary meaning. | a sub-division of a wireless channel |

Much like the dispute regarding the terms "channel" and "communications channel," the parties' primary dispute pertains to the inclusion of the word "wireless" in T-Mobile's proposed construction.  However, as discussed in detail above and as Plaintiff acknowledges, the '304 Patent *only* discusses methods and apparatuses for *wireless* transmission of data.  In fact, both the intrinsic record and Plaintiff's arguments acknowledge that the '304 Patent was directed at improving *wireless* communication techniques.  *See* '304 Patent at Col. 1, ll. 37-40 ("Conventionally, the data is transmitted from the data sensors to the data processing function via conventional conductors or cables which impose obvious inconveniences and limitations on the convenient operation of the equipment"); *see also* Opening Br. at 2.  For these reasons, Plaintiff's proposed construction is inconsistent with the intrinsic evidence and Plaintiff's own arguments and should therefore be rejected.

G.      **"Allocating Data From Said Local Data Sensors to Respective Ones or Groups of Said Sub-Channels in Accordance with the Data Carrying Capacities of Said Sub-Channels" / "Allocating of Data From Said Local Data Sensors to Respective Ones or Groups of Said Sub-Channels in Accordance with…Data Rate Requirements From Said Local Sensors"**

| **"Allocating Data From Said Local Data Sensors to Respective Ones or Groups of Said Sub-Channels in Accordance with the Data Carrying Capacities of Said Sub-Channels" / "Allocating of Data From Said Local Data Sensors to Respective Ones or Groups of Said Sub-Channels in Accordance with…Data Rate Requirements From Said Local Sensors"** |
| --- |

| (Claims 1 and 12) | |
| --- | --- |
| Plaintiff's Construction | T-Mobile's Construction |
| Plain and ordinary meaning. | allocating [allocate] data from each sensor to one or more sub-channels whose data carrying capacity closely matches that sensor's data rate requirements |

Plaintiff suggests that the "allocating" terms have a "plain and ordinary meaning" in the field of art, but cannot provide any concrete explanation of what that meaning might be.  In fact, in its argument for the "allocating" terms, Plaintiff generally discusses two possible meanings described in the specification.  *See* Opening Br. at 18.  This approach is confusing for two reasons.  First, it confirms that the "allocating" terms do not have one readily understood meaning as Plaintiff suggests and are instead susceptible to multiple constructions and interpretations.  Second, it contradicts Plaintiff's argument that T-Mobile improperly relies on the specification to construe these terms.

The "allocating" terms do not use clear language as Plaintiff suggests.  In fact, the phrases "allocating data … in accordance with" certain parameters will only serve to confuse the jury by interjecting uncertainty into the claims.  It is important to note that the '304 Patent itself repeatedly states the goal of the alleged invention is to maximize the efficiency of wireless transmissions of data by closely matching data flow requirements with the carrying capacity of various communication channels.  *See* '304 Patent at Col. 3, ll. 28-35.  As a result, the inventors clearly considered the method of "allocating" data the cornerstone of the Asserted Claims.  However, the Asserted Claims do not describe *how* data is allocated.  They merely state that data is allocated "in accordance with" certain parameters.  To understand this phrase, it is necessary to turn to the specification.

Plaintiff acknowledges that the '304 Patent distinguishes itself from prior art on the basis that data flow is "far more closely matched to the available capacity of the sub-channel" to avoid over- or underutilization. *See* Opening Br. at 20 (citing '304 Patent at Col. 3, ll. 32-35). Further, Plaintiff acknowledges that the '304 Patent discusses "comfortably match[ing] the data rate requirements of the sensors with the carry capacities of the sub-channels." *See* Opening Br. at 18-19 (citing '304 Patent at Col. 5, ll. 59-64). Based on these statements, it does not appear that Plaintiff disputes that data flow is "matched" with carry capacities. Instead, the dispute appears to be the extent to which there is a match.

T-Mobile's proposed construction of "closely matched" tracks the language of the '304 Patent without injecting additional uncertainty into the claims. For example, the terms "*far more closely matched*" and "*comfortably* matched" are contextual and susceptible to numerous interpretations. Plaintiff's attempts to rebut T-Mobile's proposed construction ignore the apparent goal of the invention as well as the explicit language of the specification. In contrast, T-Mobile's proposed construction presents the jury with a more accurate and far more understandable term.

### H.      Data Rate "Differing Substantially" / "Substantially Different" Data Rate

| Data Rate "Differing Substantially" / "Substantially Different" Data Rate (Claims 1 and 12) | |
|---|---|
| Plaintiff's Construction | T-Mobile's Construction |
| Plain and ordinary meaning. | Indefinite. |

These disputed terms, which appear in both Asserted Claims, are indefinite because the terms do not provide a person skilled in the art with reasonable certainty as to the scope of this

claim element.   In particular, the disputed terms provide an unquantifiable comparison of the "data rate" of independent claim elements.

Those skilled in the art are entitled to know, with reasonable certainty, what the metes and bounds of the disputed phrase are so they may avoid infringing claims that include this term. *See Nautilus*, 134 S. Ct. at 2129 ("[A] patent must be precise enough to afford clear notice of what is claimed, thereby 'appris[ing] the public of what is still open to them . . . .'").  As these terms are not defined anywhere in the specification of the '304 Patent and appear only once in each of the Asserted Claims, there is no way to resolve the ambiguities in the intrinsic evidence and to be reasonably certain as to the scope of the claim terms.  Thus, Claims 1 and 12 of the '304 Patent are invalid for indefiniteness.

Plaintiff states that the term "substantially" is commonly used to avoid a strict numerical boundary to a specified parameter.  In so doing, Plaintiff cites to a number of cases pre-dating the Supreme Court's *Nautilus* decision regarding indefiniteness.   As such, these cases are inapplicable to this current case involving the heightened standard for definiteness.  Further, even if those cases applied the *Nautilus* standard, their teachings do not apply here.

For example, in *Verve* the relevant term-at-issue was "substantially constant wall thickness."   *Verve, LLC v. Crane Cams, Inc.*, 311 F.3d 1116, 1119 (Fed. Cir. 2002).   In remanding the summary judgment finding of indefiniteness, the Federal Circuit noted that "[e]xpressions such as 'substantially' are used in patent documents when warranted by the nature of the invention, in order to accommodate the minor variations that may be appropriate to secure the invention."  *Id.* at 1120.  While the term in *Verve* referred to a "substantially constant" parameter, the same cannot be said of the "substantially different" terms at issue here.  For example, the term "substantially constant" clearly signifies little or no change from a known or

unknown quantity.  In other words, one of skill in the art would universally understand that regardless of the original quantity, a lack of change qualifies as "substantially constant." However, the term "substantially different" requires additional knowledge about the underlying quantities as well as an understanding of what range of difference qualifies as "substantial" in the field of art.  Here, there is no discussion of either in the intrinsic record.

Plaintiff also argues that because the '304 Patent describes allocating data to sub-channels to handle different data rates, the "substantially different" terms must necessarily be defined or else the Asserted Claims would not offer an advancement from prior art.  It appears that Plaintiff is suggesting that when a patent describes a general goal, it is left to general public to determine the bounds of that goal.  However, this understanding is plainly flawed.  In fact, it is the patentee's responsibility to clearly define the boundaries of their invention so as to give the public knowledge of what is claimed and how one might avoid infringement. *See Nautilus*, 134 S. Ct. at 2129 ("[A] patent must be precise enough to afford clear notice of what is claimed, thereby 'appris[ing] the public of what is still open to them . . . .'").

Plaintiff suggests that these terms be given their "plain and ordinary meaning," but is unable to provide any information about what that entails.  In light of the intrinsic record's silence and Plaintiff's inability to describe what the terms might mean to one of ordinary skill in the art, the Asserted Claims lack the requisite level of certainty and are therefore indefinite. *See Nautilus*, 2014 U.S. LEXIS 3818 at *6.

## V.  CONCLUSION

For the foregoing reasons, Defendant T-Mobile requests that its proposed constructions of the claim terms set forth above be adopted.

Dated: March 25, 2016

Respectfully submitted,

*/s/ John M. Jackson*

Robert P. Latham
Texas Bar No. 11975500
blatham@jw.com
John M. Jackson
Texas Bar No. 24002340
jjackson@jw.com
Blake T. Dietrich
Texas Bar No. 24087420
bdietrich@jw.com
**JACKSON WALKER L.L.P.**
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
Telephone:  (214) 953-6000
Facsimile:  (214) 953-5822

**ATTORNEYS FOR DEFENDANT
T-MOBILE USA, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that counsel of record who are deemed to have consented to electronic service are being served on this 25th day of March, 2016 with a copy of this email via the Court's CM/ECF system per Local Rule CV-5(a)(3).


/s/ John M. Jackson
John M. Jackson